**James E. NOWAK, Plaintiff,**

**v.**

**E.I. DUPONT DE NEMOURS & COM-
PANY, INC., a Delaware corpora-
tion, jointly and severally,**

**and**

**Novamed, Inc., a Texas corporation,
jointly and severally,
Defendants.**

**No. 1:92:CV:59.**

United States District Court,
W.D. Michigan.

June 29, 1993.

Carole D. Bos, Kevin J. O'Dowd, Buchanan & Bos, Grand Rapids, MI, for plaintiff.

E. Thomas McCarthy, Jr., Marilyn S. Nickell, Smith, Haughey, Rice & Roegge, PC, Grand Rapids, MI, Barry Fish, Edward M. Mansfield, Lewis & Roca, Phoenix, AZ, for defendants.

## OPINION

ENSLEN, District Judge.

The matter before the Court is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. The standard for summary

judgment is well-known, and I will not repeat it here.

### Facts

Plaintiff's complaint alleges that he was injured by a prosthesis his oral surgeon implanted in his temporomandibular joint (the "TMJ implant") on September 22, 1986. The implant was designed to replace the damaged cartilage disc in the TMJ. Plaintiff's complaint offers two theories of defendant Du Pont's liability: negligent manufacture, design, distribution, marketing and/or sale, and breach of implied and express warranties.[1] This diversity case is governed by Michigan law.

The implant in question was not manufactured by defendant. It was manufactured by a company named Vitek, which was headed by Dr. Charles Homsy. Vitek owned the patent for the TMJ implant, the material of which it was made, known as Proplast, and the process for making Proplast. One of main raw materials Vitek used to create Proplast was polytetrafluoroethylene ("PTFE"). This substance is manufactured and sold by defendant Du Pont under the registered trademark "Teflon." Vitek utilized PTFE in both its powder and fiberous forms.

In 1982, the United States Food and Drug Administration ("FDA") approved Proplast as a Class II device for various TMJ-related applications. However, in 1991 the FDA initiated a nationwide recall. Plaintiff's oral surgeon evaluated his condition after this recall, learned that plaintiff had suffered bone deterioration in his jaw, and recommended the removal of plaintiff's implants. Plaintiff alleges that the implants have caused permanent and irreversible damage to his left and right TMJs.

Plaintiff is not the only person to suffer these maladies. Several hundred implant recipients filed lawsuits, and Vitek went bankrupt in 1989. Plaintiff now alleges that Du Pont, as the sole supplier of the PTFE that went into Proplast and ultimately caused injury, should be held responsible for such injuries. Many other plaintiffs have made the same claim in lawsuits around the country, and each party cites several summary judgment dispositions in support of its position.

Plaintiff does not allege that PTFE is an inherently dangerous substance; it has many safe and successful applications. Plaintiff alleges that PTFE was unfit for use in a TMJ implant, that defendant knew that it was unfit, and that defendant had a duty to prevent or warn of the harm which it could foresee would result from its use.

It is undisputed that defendant knew that Dr. Homsy intended to use PTFE to create implants. On several occasions, defendant stated clearly that it did not warrant PTFE's suitability for any particular medical use. For example, on January 2, 1969, a representative of defendant sent a letter to Dr. Homsy which included the following statement:

> We should like to point out that our fibers are manufactured for textile uses. We do not consider ourselves medically competent to judge their suitability for medical applications and we have not conducted the long-term tests required to satisfy us of their safety in such uses. The development of medical applications for our fibers has been entirely the responsibility of the medical profession.

Plaintiff's Exhibit W. On May 13, 1977, a representative of defendant sent Vitek a policy statement regarding the surgical use of plastic materials. In relevant part, it states,

> The following is a statement of the conditions under which the Fluorocarbons Division of the Plastic Products and Resins Department can supply either experimental or commercial quantities of its resins for medical or surgical purposes. By signing and returning to us a copy of this statement, persons contemplating such uses must understand and accept these conditions and must assure us that the applicable legal requirements are being met before any shipments can be made or any technical help extended with respect to such uses.

---

1. Counts 3 and 4 of plaintiff's complaint are directed at the second named defendant, Novamed. On March 19, 1993, this Court dismissed the complaint against Novamed without prejudice.

Du Pont Teflon fluorocarbon resins ... are made for industrial purposes only. We conduct such tests as are needed to protect the ordinary users of these products but do not perform the detailed, long-term studies which should be made before they are used for medical or surgical purposes. We make no medical or surgical grades and have not sought or received any rulings from the [FDA] or from any governmental agency as to the safety or effectiveness of these products for such purposes. Persons proposing to evaluate or to use these products for medical or surgical purposes must rely on their own medical and legal judgment without any representation on our part. They must accept full responsibility for all consequences, either direct or indirect. Any data or information from Du Pont is supplied in good faith but its applicability in any particular situation must be determined by the recipient.

Lindell Affidavit, Exhibit 1.

Finally, a 1981 brochure entitled "Teflon, Safety in handling and use," includes the following statement:

In examining the medical literature, one finds that Teflon implants have been successfully used in heart valves, hip joints, knee joints, jaw bones, arteries, bile ducts, windpipes and corneas. The medical profession has done and is doing an excellent job in this area. Du Pont can accept neither credit nor responsibility for the benefits or consequences of these endeavors. It is recommended that the judgment of the medical profession be relied upon as to the suitability and safety of Teflon in any of the many specific medical applications where Teflon could be utilized.

Plaintiff's Exhibit II.

### Discussion

#### Plaintiff's Negligence Count

■ Defendant's motion for summary judgment first argues that it owed no duty to plaintiff, and therefore cannot be found negligent. Duty is a question of law which is appropriate for resolution on summary judgment. *Glittenberg v. Doughboy Recreational Industries,* 441 Mich. 379, 491, 491 N.W.2d 208 (1992). Defendant offers four alternative theories in support of its position. It asserts (1) that bulk suppliers to FDA-regulated medical product manufacturers do not owe a duty to remote users; (2) that suppliers of raw materials that are not inherently defective do not owe a duty to assure the safety of specialized applications of those materials; (3) that bulk suppliers of materials do not owe a duty to warn remote users when the materials are sold to a "sophisticated purchaser"; and (4) that Vitek substantially changed Du Pont's product when it created Proplast and the TMJ implant.

Michigan law does not define what duty bulk suppliers to FDA-regulated manufacturers owe to the eventual consumers of those products. However, it does address the duty suppliers of raw materials which are not inherently defective owe to the ultimate consumers of products which incorporate their materials. Applied to the facts of this case, Michigan law does not impose a duty on such a supplier.

I find that the Sixth Circuit's disposition of *Childress v. Gresen Manufacturing Co.,* 690 F.Supp. 587 (E.D.Mich.1988), *aff'd,* 888 F.2d 45 (6th Cir.1989), is dispositive in this case. The plaintiff in *Childress* sustained severe injuries while operating a log splitter. Defendant was the manufacturer of a hydraulic valve used in the machine. This component part was designed specifically for use in the log splitter which injured plaintiff, and plaintiff asserted that its lack of a feature known as a "deadman's control" was the proximate cause of his injury. Plaintiff argued that defendant negligently supplied the valve to the log splitter manufacturer because it knew or should have known that its use would create an unreasonable risk of danger.

The Sixth Circuit rejected plaintiff's argument and affirmed the trial court. After analyzing two of the leading Michigan cases in this area[2], the court concluded that "un-

---

**2.** *Jordan v. Whiting Corp.,* 49 Mich.App. 481, 212 N.W.2d 324 (1973), *aff'd in pertinent part,* 396 Mich. 145, 240 N.W.2d 468 (1976); *Scott v. Allen Bradley Co.,* 139 Mich.App. 665, 362 N.W.2d 734 (1984).

der Michigan law a component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its nondefective component part." 888 F.2d at 49.

Plaintiff's attempts to distinguish *Childress* from the case at bar are unpersuasive. Plaintiff's assertion that the *Childress* result was based on the component manufacturer's lack of knowledge of how its product would ultimately be used is belied by the fact that the *Childress* defendant designed its valve specifically for the ultimate product. Secondly, plaintiff asserts that it wasn't the new combination of materials found in Proplast which caused his injuries, it was the PTFE. However, that was essentially the claim of the *Childress* plaintiff as well—but for this valve, the accident would not have occurred. Like PTFE, the valve was a component part with a variety of safe uses. Like PTFE, there was no allegation that there was anything inherently dangerous about the valve before it was integrated into the completed log splitter.

Plaintiff's reliance on *Adkins v. GAF Corporation*, 923 F.2d 1225 (6th Cir.1991) is misplaced. In *Adkins*, the court found that the supplier of asbestos could be liable for the subsequent injuries of employees, despite the fact that their employer was in a better position to warn them of the dangers of the product. However, this conclusion was premised on Ohio law, and Ohio law concerning strict liability at that.

Plaintiff asserts that its theory of liability does not ask defendant to investigate the safety of the many uses of its raw material, but to act on information it already possessed. This concept may be appealing in the abstract, but the facts of this case do not line up. I have been presented with no evidence in support of plaintiff's assertion that defendant "knew that the use of Teflon and PTFE in a weight-bearing joint caused

serious injuries, and also knew that the FDA did not have knowledge of this." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 18.

It is uncontested that Du Pont knew of medical evidence from the 1960s which suggested that pure PTFE was not a suitable material for hip implants. Letters from its employees to Dr. Homsby directing his attention to such information prove the point. However, this medical evidence was not a product of any in-house research; it was produced independently and published in generally available medical journals. David Link was the Director of the Bureau of Medical Devices during the FDA's review of Proplast. In his affidavit, he states that "Proplast was subject to extensive FDA evaluation" by three separate FDA panels, and that these panels were aware of the published evidence and opinion about the risks of PTFE's use in implants. Link Affidavit, paragraphs 1, 6 and 7. Construing the facts in the light most favorable to the non-movant, I cannot accept the unsupported assertion that the FDA was unaware of these published studies.

### *Plaintiff's Breach of Express or Implied Warranty Count*

■ I find absolutely no evidence that defendant made any express warranties for TPFE's use in medicine. To the contrary, on several occasions defendant reminded Dr. Homsby and Vitek that it had only tested TPFE for industrial use, and that it had no independent knowledge of its safety or utility outside that context.

An implied warranty is the unspoken assurance that a product is reasonably fit for the purpose intended. Defendant's "medical disclaimer" defeats plaintiff's implied warranty claim as well. Defendant explicitly stated that it did not know whether PTFE was reasonably fit for Dr. Homsby's intended

---

Plaintiff relies on *Scott* in support of its position. However, the Sixth Circuit distinguished this case,

> because in *Scott* there was an actual defect in the component part, whereas in this case the valve was alleged to be misapplied rather than defectively designed.... [T]he language in

*Scott* is overly broad in stating that a manufacturer of a component part with knowledge of the final design of the completed product is responsible for the safety of the final product if the component part becomes potentially dangerous in its ultimate use.

*Childress*, 888 F.2d at 49.

purpose. To require that a supplier of bulk materials for new medical devices so warrant would be a significant obstacle to the development of new products and technology. The law placed the responsibility for the assurance of safety with Dr. Homsby and Vitek, not Du Pont.

### Conclusion

Plaintiff's injuries are tragic. However, the law and sound policy do not permit him to recover from the supplier of a component part to a medical device. As a result, defendant is entitled to summary judgment on the legal questions of duty and warranty.

### JUDGMENT

In accordance with the Opinion entered on this date;

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (dkt. # 18), filed January 8, 1993, is **GRANTED.**

**JUDGMENT** is therefore rendered **IN FAVOR OF E.I. DUPONT DE NEMOURS & COMPANY, INC.,** and against James E. Nowak.

Inasmuch as Novamed, Inc., was dismissed on March 19, 1993, this **JUDGMENT is FINAL** and the file is **CLOSED.**

**IT IS FURTHER ORDERED** that the parties' joint motion for oral argument, filed May 4, 1993, is **DENIED.** (dkt. # 49)